## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## McALLEN DIVISION

| | | |
|---|---|---|
| **MELISA AGUILAR** | § | |
| **Plaintiff** | § | |
| | § | **CIVIL ACTION NUMBER** |
| **v.** | § | **M-03-243** |
| | § | |
| **ARTHRITIS OSTEOPOROSIS** | § | |
| **CENTER, ET AL.** | § | |
| **Defendants** | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

With the consent of the parties pursuant to 28 U.S.C. § 636(c), this case was tried to the Court without a jury.  Plaintiff Melisa Aguilar brought suit against Dr. Jorge C. Zamora-Quesada ("Zamora") and medical clinics he owns and operates, alleging retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

Aguilar was fired after working for Zamora for less than two weeks.  She found herself in the middle of what one former employee described as a "soap opera," which included allegations by other employees that Zamora had sexually harassed them.  Aguilar does not allege that she was sexually harassed herself, but rather that she was fired in retaliation for her involvement with sexual harassment complaints by other employees.  Although Zamora may have treated Aguilar unfairly, this does not necessarily mean that she is entitled to relief under Title VII.  As discussed below, because Aguilar did not personally engage in protected activity within the meaning of Title VII, her retaliation claim fails.

After considering the evidence, applicable law, and the arguments and briefing of counsel,

the Court makes the following findings of fact and conclusions of law[1]:

## FINDINGS OF FACT

1.      Plaintiff Aguilar is a resident of Brownsville, Texas.

2.      Defendant Zamora is a medical doctor residing in Hidalgo County, Texas.  He is the owner and CEO of Defendant Arthritis Osteoporosis Center ("Center"),[2] which has offices in Edinburg and Brownsville, Texas.

3.      In late November 2002, Aguilar interviewed with Mary Tipton for a job at Zamora's Brownsville location.  Tipton was the office manager there and had herself just begun working for Zamora earlier that month.  Aguilar was ultimately hired to work as an assistant to Tipton in Brownsville.  While in the office for her interview, Aguilar was briefly introduced to Zamora and his wife, Meisy Zamora, who also seems to have worked at the Center in some capacity.  Zamora does not remember meeting Aguilar.

4.      Aguilar began working for Zamora on December 3, 2002.  Later that week, on Friday, December 6, Aguilar accompanied Tipton to the Edinburg office.  Aguilar had never been to the Edinburg office and did not know any of the employees working there.

5.      Tipton went to the Edinburg office at Zamora's direction in order to discipline two employees there.  One of them was Olga Gonzalez ("Olga"), whose sister, Alma Gonzalez ("Alma"), also worked in that office.  Zamora told Tipton that Olga had been insubordinate, apparently by

---

[1]      All findings of fact set forth below are to be considered as conclusions of law, and vice versa, where appropriate.

[2]      Plaintiff names as Defendants other entities that are allegedly owned and operated by Zamora.  (*See* Docket No. 3, Amended Complaint para. 1).  For simplicity, these entities will be referred to collectively as the "Center."

talking back to him.  Aguilar's role was essentially to act as Tipton's "shadow" and assist her as necessary (*e.g.*, by taking notes).  Elizabeth Jasso, the Center's human resources director, also came to the Edinburg office for the disciplinary meetings.

6.     Tipton, Aguilar, and Jasso met with Olga in a conference room.  Olga began screaming and crying almost immediately after entering the room.  Olga told Tipton that Tipton did not understand anything and that Tipton should run away before something happened to her (Tipton).  When Tipton asked Olga to explain, Olga stated that Zamora had offered her money to sleep with him.  Olga also said that Zamora offered to pay for cosmetic nose surgery and English classes (since she was illegal and wanted to get immigration papers), and to employ other members of Olga's family.  All Olga needed to do was to sleep with Zamora at least three to four times a year, just like he was doing with the Edinburg office manager (Mary Avila).  In addition to all this, Olga claimed that Zamora engaged in conduct such as grabbing her hand and pulling it toward his crotch.  After hearing Olga's description of the doctor's conduct, Tipton told Olga that she would help her.

7.     During all this, Olga was hysterical and ultimately suffered an asthma attack.  Hearing the commotion, other employees entered the room.  Among them was Olga's sister, Alma, who attempted to calm Olga down.  Alma was pregnant and made a comment regarding "the doctor's baby," which Aguilar and Tipton understood to mean that Alma was carrying a child by Zamora.

8.     Zamora's wife also entered the conference room for a short time at some point during the meeting.  Mrs. Zamora later met separately with Tipton and made reference to rumors of an affair between Olga and her husband.  At some point, Mrs. Zamora also became aware of Alma's suggestion that she (Alma) was carrying the doctor's baby.

9.     Later, Tipton, Aguilar, and Jasso returned to the Brownsville office.  Aguilar and

3

Tipton traveled together in the same car, along with an office runner.  Because both Aguilar and Tipton felt the information they had received was confidential, there was no discussion during the ride to Brownsville about what had occurred in Edinburg.

10.     After returning to Brownsville that afternoon, Tipton instructed Aguilar to wait in the records room while Tipton and Jasso went to talk with Zamora.  Tipton and Jasso did not indicate to Aguilar what they were going to talk with Zamora about.

11.     During the meeting with Zamora, and in the presence of Jasso, Tipton informed him that Olga had made allegations of sexual harassment against him. Alma's suggestion that she was carrying the doctor's baby also appears to have been discussed.  Zamora's response was to become very upset and shout at Tipton and Jasso, asking how their assignment to discipline Olga could have turned into this.  Significantly, Tipton further told Zamora that she felt that Zamora had also sexually harassed her (Tipton).  Tipton followed up her oral sexual harassment complaint against Zamora by making a written complaint that she delivered to Jasso the next week.

12.     In describing the basis for this sexual harassment complaint, Tipton testified that during her first month working for Zamora, he had engaged in several acts of sexual harassment. These included hugging her in a sexual manner, attempting to kiss her on the mouth, looking her up and down, and making inappropriate inquiries (*e.g.*, asking whether Tipton's husband was home, whether he was the jealous type, what she would be wearing the next day, and whether she was available to go to the Yacht Club with him).

13.     After Tipton emerged from the meeting with Zamora and Jasso, she went with Aguilar to the break room.  By this time it was after 5:00 p.m., and all other employees had gone home.  Tipton began to cry.  Although Aguilar did not remember the details of what Tipton said at

that time, the parties have stipulated that, at some point, Tipton informed Aguilar that Zamora had

tried to kiss or grab her.

14. Aguilar next saw Tipton at work the following Monday, December 9, 2002, but no

comment was made regarding the events that transpired the preceding Friday.  Aguilar testified that

later in the day as Zamora was leaving the office, he passed her in the hallway and stated, "You

[Aguilar] were there in the [Edinburg] meeting, too."  Aguilar responded affirmatively, indicating

that she was there as Tipton's assistant (or words to that effect).  Nothing further was said.  However,

it is clear from this encounter and from Zamora's later testimony that he viewed Aguilar's presence

at the meeting with Tipton as significant.

15. Tipton came into work Tuesday, December 10, 2002, only to leave early complaining

of being ill.  She did not return to work for Zamora either that day or ever.  In Tipton's absence,

Zamora promptly promoted Angelica Solis to office manager.  Aguilar would work the next two days

as an assistant to Solis.

16. Tipton called Aguilar on Thursday, December 12.  Tipton informed Aguilar that

Zamora had fired her.

17. Zamora claims to have no recollection of firing Aguilar.  When asked to explain

Aguilar's termination, he responded: "I don't know.  She disappeared one day.  She appeared one

day that I didn't know, and she disappeared one day that I didn't know.  And in between, there were

three weeks, and that's it.  And I didn't see her."

18. It is clear, however, that Zamora did fire Aguilar.  Tipton had no reason to fire

Aguilar; indeed, at that point Tipton was no longer the office manager (or even coming to work).

Solis had been acting as the office manager and working with Aguilar only a day or two.  Solis flatly

denies firing Aguilar and confirms that Zamora made the decision to terminate her employment.

19.     In attempting to suggest a legitimate reason for Aguilar's termination, Defendants rely principally on Aguilar's own testimony.[3]  When Tipton told Aguilar that Zamora had fired her, Aguilar expressed disbelief.  Tipton then played part of a tape recording she had made of a telephone conversation with Zamora earlier that day (December 12).  Solis was with Zamora on a speaker phone during the call.  Aguilar heard Solis tell Zamora that Aguilar did not want to cooperate with her.  Aguilar also heard Zamora tell Tipton to fire Aguilar.

20.     Solis acknowledged that she told Zamora that Aguilar was not cooperative.  But Solis did not describe the specific nature of Aguilar's lack of cooperation, other than to say that she (Solis) was new as the manager "and it was just a change, so that was the problem I had."  As already noted, Solis had been working with Aguilar only a day or two.  Aguilar denies that she was uncooperative, but she was never given the opportunity to address Solis' concern before being fired.

21.     Zamora's firing of Aguilar does not appear consistent with his treatment of other employees.  For example, Zamora instructed Tipton to discipline (or "write up") Olga Gonzalez after she was allegedly insubordinate to him.  This was the original purpose of the December 6 meeting.  Zamora did not immediately fire Olga without a warning or explanation, as was done to Plaintiff Aguilar.  Zamora also discussed another employee (Thelma Alaniz) who was not fired for several years, despite Zamora's assertion that she had a long "track record" of poor performance as a

---

[3]     This is reflected by Defendant's Second Motion for Summary Judgment, which argues that Aguilar should not prevail on her Title VII claim because there was a legitimate, non-discriminatory reason for her termination.  (*See* Docket Nos. 60, 61).  This motion was taken under advisement.  After considering the evidence, the Court concludes that Defendants' Second Motion for Summary Judgment lacks merit because there is a disputed issue of fact regarding Zamora's real motive for firing Aguilar.

receptionist, was consistently late for work, refused to attend meetings, and did not properly handle money that came into the Center. Here again, Zamora did not terminate her employment until after she had been given a written reprimand and the opportunity to improve.

22.     Both Olga and Alma Gonzalez left their employment with Zamora on December 9, 2002, which was the Monday following the meeting in which Olga made sexual harassment allegations against Zamora. The sisters apparently did not explain why they left their jobs, although Olga had said during the December 6 meeting that she was afraid of Zamora.

23.     On about December 10, 2002, Tipton submitted her internal sexual harassment complaint to Jasso (the Center's human resource director), detailing Zamora's alleged sexual harassment against her (Tipton).[4] Zamora terminated Tipton's employment as of December 13, although he conveniently does not remember it happening that way (like his faulty recollection of Aguilar's termination).[5] Tipton initiated communication with Tonyaa Schiver, an EEOC investigator, by a letter dated December 20, 2002. However, Tipton did not file a complaint with the EEOC until April 8, 2003.

24.     As readily admitted by Aguilar and stipulated by the parties, she was not sexually harassed during her short employment at the Center. It is also undisputed that during her employment Aguilar did not personally report any instances of sexual harassment or complain to

---

[4]     Tipton states that Jasso later told her that Tipton's personnel file was missing, so Tipton faxed Jasso a second copy of her sexual harassment complaint and dated this copy December 13, 2002.

[5]     Zamora's suggestion that he did not fire Tipton is belied by the evidence. Another Center employee, Cesar Lopez, was present with Zamora during the phone conversation in which Zamora fired Tipton. Lopez confirms Tipton's statement that Zamora fired her during the call. The Court finds that Zamora's testimony lacks credibility in this and other respects.

Zamora (or anyone else) about sexual harassment directed at any other Center employee.  On April 11, 2003, Aguilar filed a complaint with the Texas Commission on Human Rights and the EEOC, alleging retaliatory discharge in violation of Title VII.  The EEOC notified Aguilar of her right to bring a civil action under Title VII on August 8, 2003.

25.     Aguilar filed the instant Title VII retaliatory discharge action in September 2003.  In December 2003, Zamora filed a defamation lawsuit against Aguilar and Tipton in state court, which was subsequently removed to federal court.  *Zamora-Quezada v. Tipton, et al.*, Case No. M-04-cv-067.  Zamora's principal basis for this claim was that a Center employee claimed to have overheard Aguilar make allegedly disparaging comments regarding Zamora and the Center.  This was said to have occurred at a pharmacy class about six months after Aguilar was fired from the Center.  Significantly, Zamora also cited Aguilar's presence at the December 6, 2002 meeting in support of his defamation claim.  He accused Tipton and Aguilar of fabricating Olga Gonzalez's sexual harassment complaints.  This accusation is puzzling since all three women who met with Olga—Tipton, Aguilar, and Jasso—reported essentially the same thing about Olga's sexual harassment complaints.  Jasso was the Center's human resources director and continued working for Zamora for some time after these events.  Zamora emphasized that Aguilar was present at the December 6 meeting and described Aguilar as a friend of and an "accessory" to Tipton, apparently based on nothing more than the fact that Aguilar was with Tipton when Olga made sexual harassment complaints against Zamora.  Zamora later dropped his defamation claim against Aguilar and Tipton.

26.     Various former Center employees (not including Aguilar) filed Title VII sexual harassment claims against Zamora in federal court.  Those former employees alleging sexual harassment included both Tipton and Solis (who Zamora had selected to replace Tipton as the

Brownsville office manager).  A consolidated case involving four former Center employees was tried to a jury in September 2005.  *Alaniz, et al. v. Zamora-Quesada*, Case No. M-03-cv-108 (S.D. Tex. Sept. 29, 2005).   A unanimous jury found that Zamora had sexually harassed all four plaintiffs—Tipton, Solis, Thelma Alaniz, and Noelia Galvan-Santiago.  (*Id.* at Docket No. 149.) The jury also found that Zamora violated Title VII's anti-retaliation provision by discharging Tipton, Solis, and Alaniz for engaging in protected conduct (by complaining about his sexual harassment). (*Id.*)  The jury further found that Zamora had acted with malice or reckless indifference regarding all four plaintiffs' Title VII rights and awarded punitive damages.  (*Id.*)  Post-trial motions are pending in that case, and Zamora presumably intends to appeal the judgment entered by the District Court.[6]

## CONCLUSIONS OF LAW

In light of the preceding factual determinations, the Court must analyze whether Aguilar has established that Defendants violated Title VII in terminating her employment.

Title VII not only protects against employment-related discrimination, but it also includes the following anti-retaliation provision:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  The Supreme Court has stated that the primary purpose of the anti-

---

[6]      This summary of related litigation involving allegations of sexual harassment against Zamora is provided as background only.  It is not directly relevant to Aguilar's claims and has not been considered as evidence in this case.

9

retaliation provision is to insure "unfettered access to statutory remedial mechanisms." *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2412 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)).

Title VII imposes liability for unlawful retaliation where "(1) the employee engaged in activity protected by Title VII, (2) the employer took adverse employment action against the employee, and (3) a causal connection exists between that protected activity and the adverse employment action." *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372 (5th Cir. 1998). The ultimate determination is whether, "but for" the protected activity, the employer would not have taken the adverse employment action. *Long v. Eastfield College*, 88 F.3d 300, 305 n.4 (5th Cir. 1996).

In the present case, Plaintiff Aguilar has satisfied the second element of a Title VII retaliation claim in that her termination was clearly an adverse employment action. As to the third element, the Court finds that Defendant Zamora's decision to fire Aguilar was motivated, at least in part, by his belief that Aguilar was somehow involved with sexual harassment complaints against him. The critical issue here is whether Aguilar has satisfied the first element of a retaliation claim; namely, whether she actually engaged in protected activity within the meaning of Title VII.[7]

Consistent with the statutory language, protected activities under Title VII fall into two broad categories—opposition and participation. *Douglas*, 144 F.3d at 372. An employee has engaged in protected activity when she has (1) "*opposed any practice* made an unlawful employment practice"

---

[7]      For the reasons that follow, the Court ultimately concludes that Aguilar did not engage in a statutorily-protected activity. In light of this conclusion, it is unnecessary to make an ultimate finding on whether but for the protected activity, Zamora would not have fired Aguilar.

by Title VII or (2) "made a charge, testified, assisted, or *participated in any manner* in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3(a) (emphasis added); *see also Grimes v. Texas Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996).

Aguilar contends that she engaged in both protected participation and opposition activity. With regard to opposition activity, Aguilar does not appear to argue that she personally opposed any sexual harassment by Zamora (or any other prohibited employment practice).  Rather, she argues in post-trial briefing that she engaged in protected activity through her association with Tipton, who Aguilar asserts did engage in protected opposition activity.[8]  Both of these arguments will be addressed in turn.

## A.     Protected Participation Activity

Plaintiff Aguilar contends that she engaged in protected participation activity by virtue of her involvement in the Center's internal investigation regarding Olga Gonzalez's allegations that she had been sexually harassed by Zamora.  The sum total of Aguilar's activity was to attend the December 6 meeting as Tipton's assistant.  Tipton intended to discipline Olga for insubordination at the meeting, but Olga made allegations of sexual harassment against Zamora soon after the meeting

---

[8]     Arguments raised for the first time in post-trial briefing are waived.  *See Weiner v. United States*, 255 F. Supp. 2d 663, 668 (S.D. Tex. 2002) (argument raised for the first time in motion to reconsider following decision on summary judgment was waived); *see also Reich v. Lancaster*, 55 F.3d 1034, 1056 (5th Cir. 1995) (arguments not raised in closing arguments or adopted pretrial summary judgment briefings are waived).  Plaintiff emphasized the participation argument in pretrial briefing, but she did make at least passing reference to the theory that her association with Tipton constituted protected activity by virtue of Tipton's opposition activity. (*See* Plaintiff Melisa Aguilar's Submission of Matters for Consideration at Trial, Docket No. 77 at 3.)  Under these circumstances, Plaintiff's opposition by association theory will be considered in the interest of justice.

began.  Aguilar does not dispute that during her brief employment neither Olga nor any other Center employee had filed a formal sexual harassment or discrimination charge with the EEOC.  She argues instead that her involvement in the internal sexual harassment "investigation" constitutes protected activity under Title VII.[9]

In considering this argument, it is appropriate to start with the relevant language of the statute, which forbids an employer from discriminating against an employee who has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing *under this subchapter*."  42 U.S.C. § 2000e-3(a) (emphasis added).  Giving effect to the words "under this subchapter" suggests that protected participation activity is limited to investigations or proceedings instituted under Title VII.  That is the conclusion reached by the Eleventh Circuit, which has held that "[t]his clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC."  *E.E.O.C. v. Total System Services, Inc.* 221 F.3d 1171, 1174 (11th Cir. 2000).

Cases decided by the Fifth Circuit also reflect that the participation clause does not apply in the absence of a formal charge filed with the EEOC.  In *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419 (5th Cir. 2000), the Fifth Circuit held that the participation clause was not applicable where the plaintiff "did not file a charge with the EEOC until *after*" plaintiff's alleged retaliatory discharge took place.  *Id.* at 428 (emphasis in original).  Similarly, the Court of Appeals in *Douglas* refused to find that the plaintiff had engaged in protected activity where the plaintiff, dissatisfied with her

---

[9]        The Court will assume (without deciding) that the December 6 meeting could be characterized as part of an internal sexual harassment investigation.

12

employment performance evaluation, composed and distributed—to her employer, coworkers, and a whistle-blower officer with the Department of Energy—a five-page response in which she stated that she had been subjected to racial and sexual discrimination. *Douglas*, 144 F.3d at 367.  The Fifth Circuit emphasized that the plaintiff told the whistle-blower officer not to treat the letter as a formal complaint: "She thus did not participate in an 'investigation, proceeding, or hearing' within Title VII's parameters." *Id.* at 373.

Other courts have reached the same conclusion.  For example, the Sixth Circuit has held that "Title VII protects an employee's participation in an employer's internal investigation into allegations of unlawful discrimination where that investigation occurs *pursuant to a pending EEOC charge*." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 543 (6th Cir. 2003) (emphasis added). The Eighth and Ninth Circuits have also held that the participation clause is meant to protect only participation in the machinery set up by Title VII to enforce its provisions; in other words, participation in administrative investigations into employer discrimination. *See Brower v. Runyon*, 178 F.3d 1002, 1006 (8th Cir. 1999); *Vasconcelos v. Meese*, 907 F.2d 111, 113 (9th Cir. 1990); *see also Washco v. Federal Express Corp.*, 402 F. Supp. 2d 547, 555 (E.D. Pa. 2005) (plaintiff's participation in internal investigation is not protected activity "because at the time of the investigation no formal charge had been filed with the EEOC").

In applying this legal authority to the present case, the critical fact is that Aguilar's involvement in any internal investigation occurred before anyone at the Center filed a complaint with the EEOC.  As was the case in both *Byers* and *Douglas*, EEOC charges were not filed by any Center employee until after Aguilar's termination.  Aguilar's own complaint was not filed until months later.

13

Aguilar argues, however, that her case is distinguishable from the *Byers* line of cases in that the "employee in *Byers* had not placed his employer on notice of pending EEOC charges."  In contrast, according to Aguilar, here there is some evidence that, prior to Aguilar's termination, Zamora was aware of the possibility that Olga and Tipton might file EEOC complaints.  But this factual distinction (assuming it exists) is not determinative, as shown by the Fifth Circuit's holding in *Douglas*.  In that case the employer was clearly on notice that a formal complaint might be filed at some point since the plaintiff had already made allegations of discrimination in writing.  Yet the Court held that the plaintiff had not engaged in protected participation activity because, as here, no formal EEOC complaint had been filed prior to her termination.  *Douglas*, 144 F.3d at 367.[10]  In accordance with the unambiguous wording of Title VII's anti-retaliation participation clause and the weight of authority in the Fifth Circuit and elsewhere, Aguilar's claim that she engaged in protected activity by participating in a purely internal investigation must be rejected.[11]

_____

[10]      In the instant case, Tipton informed Zamora on December 6, 2002, that Olga had made allegations of sexual harassment against him.  Tipton also advised Zamora that he had sexually harassed her as well.  But it is unclear whether Tipton specifically told him that either Olga or she planned to file a formal complaint with the EEOC.  In any event, the key point is that no Center employee had filed such a complaint before Aguilar was fired.

[11]      Aguilar cites *EEOC v. Molle Chevrolet, Inc.*, 1992 WL 443562 (W.D. Mo., Dec. 22, 1992), and *McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir. 1996), for the proposition that the participation clause should be interpreted broadly to include circumstances (such as those arguably present here) where the employer discriminates against an employee based on a mistaken belief that the employee has participated in a Title VII investigation.  These cases are distinguishable, however, since in both cases a formal EEOC complaint had been filed prior to the employee's termination.  *See McDonnell*, 84 F.3d at 262 (employee fired for "passive resistance" in failing to prevent another employee from filing formal sexual harassment complaint);  *Molle Chevrolet*, 1992 WL 443562 at *3 (supervisor knew that female employee had filed an EEOC discrimination charge and that she was keeping notes of her treatment on the job; plaintiff was a male co-worker who was fired based on the supervisor's belief that he had assisted the female employee by retrieving her notebook from the supervisor's office).

**B.      Protected Opposition by Association**

At first blush, the opposition clause would appear to be irrelevant in this case.  Plaintiff Aguilar has stipulated that during her employment at the Center: she was not sexually harassed; she did not complain of sexual harassment; she did not report sexual harassment; she did not object to Zamora's alleged sexual harassment of other employees; and she did not tell anyone at the Center about reports of sexual harassment.  (Docket No. 78, paras. 8–10.)  In short, she admittedly did nothing to personally oppose sexual harassment at the Center.  Nevertheless, Aguilar argues that the opposition clause applies because she assisted and associated with Tipton, who herself opposed Zamora's sexual harassment.  Aguilar also contends that the opposition clause applies based on Zamora's mistaken belief that she engaged in opposition activity.

Analysis of these issues again starts with the language of the statute.  Under Title VII's anti-retaliation provision, an employee has engaged in protected opposition activity when "[s]he has opposed any practice made an unlawful employment practice" by Title VII.  42 U.S.C. § 2000e-3(a).  On its face, the opposition clause protects a plaintiff who has affirmatively opposed an unlawful employment practice.  The Fifth Circuit has stated that protected expression under this clause "*requires conduct by the plaintiff* that is in opposition to an unlawful employment practice of the defendant."  *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1136 (5th Cir. 1981) (emphasis added).  At the same time, unlike the participation clause, there is no requirement that the opposition activity be in connection with a formal EEOC complaint.  *See Beckvar v. Home Depot U.S.A., Inc.*, 2005 WL 1155697 (S.D.Tex. April 18, 2005) ("An informal oral complaint may

constitute protected activity.") (citations omitted).[12]

In urging her theory of opposition by association, Aguilar correctly notes that the "provisions of Title VII must be construed broadly in order to give effect to Congress' intent in eliminating invidious employment practices."  *Jones*, 793 F.2d at 726.  But this does not mean that a court has carte blanche to judicially amend the statute.

In addition to being contrary to the wording of the opposition clause, Aguilar's opposition by association theory is contrary to the Fifth Circuit's holding in *Holt v. JTM Industries, Inc.*, 89 F.3d 1224 (5th Cir. 1996).  *Holt* addressed the anti-retaliation provision found in the Age Discrimination in Employment Act (ADEA), which contains an opposition clause that is identical in all material respects to the one found in Title VII.[13]  The case involved a retaliation claim made

---

[12]    The opposition clause does not limit protected activity to opposing discrimination directed against the employee herself.  Protected opposition activity also includes opposing discrimination or sexual harassment that was directed to another employee.  *See Jones v. Flagship Int'l*, 793 F.2d 714, 727 (5th Cir. 1986) ("employee opposition to discriminatory employment practices directed against a fellow employee may constitute" protected activity under Title VII).  To the extent that Aguilar argues that she somehow opposed Zamora's alleged sexual harassment of Tipton or Olga Gonzalez, the evidence is to the contrary.  The only conduct by Aguilar that could remotely support such an inference is her brief hallway encounter with Zamora, which occurred a few days after Aguilar attended the December 6 meeting in which Olga complained of sexual harassment.  In response to Zamora's statement that she had been at the meeting, Aguilar responded with words to the effect that she had attended the meeting in her capacity as Tipton's assistant.  Aguilar's own testimony makes clear that she did not intend her response to suggest her support for Olga's or Tipton's sexual harassment complaints.  In any event, Aguilar's neutral response cannot qualify as protected activity.  *See Baker v. Union Pac. R.R. Co.*, 145 F. Supp. 2d 837, 844 (S.D. Tex. 2001) ("To qualify as protected activity, the complaints must relate clearly to discrimination covered by Title VII."); *Dupont-Lauren v. Schneider (USA), Inc.*, 994 F. Supp. 802, 823 (S.D. Tex. 1998) ("Vagueness as to the nature of the grievance ... prevents a protest from qualifying as protected activity.").

[13]    The *Holt* Court noted the similarity of the two anti-retaliation provisions and observed that cases interpreting Title VII's provision are often relied upon in interpreting the ADEA's provision.  *Holt*, 89 F.3d at 1226 n.1.

16

by Frank Holt, who was fired from his job after his wife, Linda, filed an EEOC complaint against

their mutual employer.  Frank prevailed at trial on his retaliation claim, and the employer argued on

appeal that it was entitled to judgment as a matter of law because Frank did not engage in any

protected activity.  The Holts did not suggest that Frank actually participated in Linda's filing of a

charge or that he opposed the employer's alleged discrimination against his wife; rather, they argued

that Linda's protected activity should be imputed to her husband Frank.  *Holt*, 89 F.3d at 1226.  The

Holts argued, in other words, that "an individual suing for retaliation need not personally engage in

any of the enumerated [protected] conduct" under the statute.  *Id.*

The Fifth Circuit rejected this argument based on the "plain language of the statute."  *Id.*  In

doing so, the Court noted that the rule proposed by the Holts would rarely be necessary to protect

employee spouses since the statute broadly protected an employee who opposed a discriminatory

practice or who "participated in any manner" in an EEOC proceeding.  *Id.*  The Fifth Circuit

acknowledged "that there is a possible risk that an employer will discriminate against a complaining

employee's relative or friend," but reasoned that it should not go beyond the language used by

Congress in attempting to define other types of relationships that should merit automatic standing

under the retaliation provision.  *Id.* at 1227.  The Court held that "when an individual, spouse or

otherwise, has not participated '*in any manner*' in conduct that is protected" by the statute, he does

not have standing to sue for retaliation.  *Id.* (emphasis in original).

The same reasoning—based on the plain wording of the statute—compels the conclusion that

Aguilar cannot prevail on her opposition by association theory.  She simply did not engage in any

opposition activity as required to invoke Title VII's anti-retaliation provision.

Aguilar fares no better on her alternate theory that liability for retaliation may be based solely

on Zamora's intent (specifically, his apparent mistaken belief that she had opposed in some manner

his sexual harassment of other employees). This argument is likewise inconsistent with the language

of the statute, which requires the employee to engage in some opposition activity. It is also contrary

to the Fifth Circuit's analysis in *Ackel v. National Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir.

2003). In that case, one of the plaintiffs, Dugan, told a non-supervisory co-worker, Gross, that the

employer's president and general manager, Hardesty, had made frequent unwelcome sexual

advances. *Id.* at 381. Gross then told Hardesty that Dugan would file a sexual harassment complaint

against him if he did not stop. In doing this, however, Gross was acting on her own; Dugan had

neither requested nor authorized Gross to make this statement to Hardesty. After Dugan was fired,

she filed suit under Title VII alleging sexual harassment and retaliation. In rejecting Dugan's

retaliation claim, the Fifth Circuit reasoned:

> Here, Dugan does not contend that she ever complained to anyone in Fox 29's
> management about Hardesty's harassment. Although Gross warned Hardesty that
> Dugan would file a complaint if the harassment did not stop, the record indicates that
> Gross was acting on her own initiative rather than at Dugan's direction. Because there
> is no evidence that Dugan actually engaged in a protected activity, she has not made
> the necessary prima facie showing.

*Id.* at 385.

In other words, although the supervisor in *Ackel* had reason to believe that the plaintiff had

expressed opposition to his alleged sexual harassment, her retaliation claim failed because in fact

she had not engaged in a protected activity. Again, applying the same reasoning here, the Court must

conclude that Aguilar has failed to show that she engaged in protected opposition activity, which is

fatal to her Title VII retaliation claim.[14]

The Court comes to this conclusion rather reluctantly, given the facts of this case. Zamora's conduct in firing Aguilar was questionable at best, and the decision in this case should not be read to condone his actions.[15] Protecting someone in Aguilar's position is arguably consistent with Title VII's broad remedial purpose. But given the complete absence of any protected activity by Aguilar, denial of her claim is compelled by the congressionally-enacted language of Title VII's anti-retaliation provision and by Fifth Circuit precedent applying this provision in analogous cases. This ruling is not inconsistent with the primary purpose of Title VII's anti-retaliation provision, which provides broad protection to "protestors of discriminatory employment practices." *Pettway*, 411 F.2d at 1006 n.18. Aguilar did nothing to protest or oppose sexual harassment at the Center. In the

---

[14]    Aguilar cites cases from other circuits applying the Fair Labor Standards Act (FLSA) and National Labor Relations Act (NLRA) in support of her argument that an employer's mere belief that an employee engaged in protected conduct is sufficient to support a retaliation claim under those statutes. (Docket No. 81 at 11–12.) It is true that several circuits have broadly construed the anti-retaliation provisions in the FLSA and NLRA. *See, e.g.*, *Brock v. Richardson*, 812 F.2d 121, 123 (3d Cir. 1987) ("a finding that an employer retaliated against an employee because the employer believed the employee complained" is sufficient to establish protected activity under the FLSA). But not all courts agree with this approach. *See Ball v. Memphis Bar-B-Q Co., Inc.*, 228 F.3d 360, 364 (4th Cir. 2000) ("While we are instructed to read the FLSA to effect its remedial purposes, the statutory language clearly places limits on the range of retaliation proscribed by the Act."). It should also be noted that the Fifth Circuit has cautioned that "reliance on the Labor Acts for interpretive guidance must necessarily be guarded because the differences between those Acts and Title VII may well outnumber the similarities." *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1006 (5th Cir. 1969). In any event, to the extent that other circuits have construed FLSA or NLRA anti-retaliation provisions more broadly than the Fifth Circuit has construed Title VII's anti-retaliation provision, this Court is bound by Fifth Circuit authority interpreting the statute at issue in this case.

[15]    Other former employees have alleged that Zamora engaged in vile sexual harassment. However, the truth of those allegations is not an issue in deciding Aguilar's retaliation claim, and the Court thus makes no findings regarding those allegations (many of which are the subject of related litigation).

absence of such statutorily-protected activity, Aguilar was an "at will" employee with no legal entitlement to continued employment—just like the vast majority of other working Texans. *See Johnson v. Delchamps, Inc.*, 897 F.2d 808, 810 (5th Cir. 1990) (under at-will employment doctrine, "both employers and employees are free to end their employment relationship at any time, and for any reason, without liability, provided that the termination violates no statutory or constitutional provision"); *Sabine Pilot Serv. Inc. v. Hauck*, 687 S.W.2d 733, 734 (Tex. 1985) (reaffirming that in Texas, "employment for an indefinite term may be terminated at will and without cause").

## C.     Costs

Based on the above findings and conclusions, Defendant Zamora is the prevailing party in this action (together with the other named entities that he owns and operates).  Rule 54(d)(1) provides that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs."  FED. R. CIV. P. 54(d)(1).  The Fifth Circuit has found that this rule carries a strong presumption that the prevailing party will be awarded costs and that denial of costs to the prevailing party is "in the nature of a penalty."  *Pacheco v. Mineta*, 448 F.3d 783, 793–94 (5th Cir. 2006) (quoting *Schwarz v. Golloder*, 767 F.2d 125, 131 (5th Cir. 1985)). Accordingly, a court must first articulate some good reason before denying costs to the prevailing party.  *Pacheco*, 448 F.3d at 794.

In *Pacheco*, the Fifth Circuit recited reasons that other courts have invoked to justify denial of costs to a prevailing party:

(1) the losing party's limited financial resources;

(2) misconduct by the prevailing party;

(3) close and difficult issues presented;

20

(4) substantial benefit conferred to the public; and

(5) the prevailing party's enormous financial resources.

*Id.*  Courts may also deny costs if the losing party prosecuted the action in good faith, but good faith alone is insufficient.  *Id.*  There must be some other good reason in addition to good faith in order to deny costs.  *Id.*

In applying this standard here, the Court finds that costs should not be awarded to Zamora and the other Defendants.  In addition to the fact that Plaintiff Aguilar litigated this action in good faith, Zamora's conduct regarding Aguilar's termination is questionable at best.  Although it was unnecessary to make an ultimate finding regarding his motivation in firing Aguilar, it is likely that Zamora is the prevailing party only because Aguilar did not in fact engage in protected activity—notwithstanding his apparent assumption that she did.  In addition, the legal issues presented a close case, given both the broad interpretation generally accorded to Title VII and rulings by courts in other circuits that arguably support Plaintiff's position.  And, finally, the disparity in financial resources between Aguilar, who was earning a modest income before she was abruptly fired, and Zamora, a financially successful doctor (as reflected by his different office locations and staff size), is a further reason to deny an award of costs.

## **CONCLUSION**

For the foregoing reasons, Plaintiff Aguilar's Title VII retaliatory discharge claim will be denied and this action will be dismissed, with the parties bearing their own costs.  A judgment consistent with these findings and conclusions will be separately entered.

The Clerk shall provide a copy of these Findings of Fact and Conclusions of Law to counsel for the parties.

DONE at McAllen, Texas, on August 25, 2006.

Peter E. Ormsby
UNITED STATES MAGISTRATE JUDGE